review, and that's the evaluation of Mr. McDonough's vocational claim. So as I was stating, Mr. McDonough was a high-level IT manager for Biogenetic, and he was required under the terms of his plan to prove that he was unable to perform the duties of his own occupation, whether it was sedentary or otherwise. Now, there's no dispute here that Mr. McDonough's occupation was sedentary, but not all sedentary occupations are the same, and the plan requires Mr. McDonough to demonstrate that he cannot perform the duties of his own occupation. Now, there are three pieces of evidence in the record that highlight what Mr. McDonough's occupation were. The first is the job description from Biogenetic, the second is the vocational report from James Parker, and third, Mr. McDonough's sworn affidavit. Now, these three documents have sort of illustrate three material duties of Mr. McDonough's occupation that were unique to his occupation. So the first was the ability to use a mouse and to keyboard. Mr. McDonough was an IT manager. James Parker said that he would be required to do so for at least 51 percent of the day. Aetna's own doctor, Dr. Joseph Ray, said that Mr. McDonough was able to use his dominant right hand for five minutes before he required a ten-minute break. That's 20 minutes an hour, or 160 minutes a day. It's one-third of the workday that Mr. McDonough was actually able to use his right hand. But you seem to be comparing that against the actual duties that Mr. McDonough claimed to have performed. The plan definition, as I understand it, required the claims administrator to look at Mr. McDonough's own occupation, not as that occupation was performed at Biogen, but as it is performed, as it is typically performed or normally performed in the national economy. And is there any evidence in the record before the claims administrator or otherwise as to how that job is typically handled in the national economy? I would argue, Your Honor, that James Parker's vocational report is perhaps the most meaningful piece of evidence in that regard. Mr. McDonough was an IT manager, and an IT manager is required to use a computer. So that's the first element. But that doesn't answer my question. I read that vocational report. I don't recall that it speaks at all about how the job is normally performed in the national economy. I would agree with you, Your Honor. I don't think Mr. Parker used those words, as performed in the national economy. And if the record is barren as to how that job is normally performed in the national economy, how does the absence of that evidence cut? Does that cut against the plaintiff because he didn't produce any such evidence? Does it cut against the company because it didn't produce any such evidence? What do we do when there is no evidence in the record about something that the planned documents seem to require in connection with a finding of a person's ability to perform his own occupation? To directly answer your question, I think the only remedy in this situation is a remand to determine what the duties of the occupation were. So you don't think that, as part of his own case, that that's part of the plaintiff's burden to produce that evidence? I would say very much so, Your Honor. I would say Mr. McDonough met that burden, however. But you just said there's no evidence of how the job is performed normally in the national economy. To clarify what I said, Your Honor, Mr. Parker's vocational report, I think, actually gets to that. But if Your Honor believes... But you just... Now, wait a minute. We're going around in circles. You just told me that Parker's vocational report doesn't mention how the job is normally performed in the national economy. Excuse me if I misspoke. I meant to say he didn't use those exact words, but I think he gets to the exact point of how the job is performed in the national economy by speaking to three specific points. The use of the computer, the ability to do full-time work, and the ability to engage with other people. But what makes you read Parker's report relating that to the national economy rather than relating it to what McDonough was doing at Biogen? Because Mr. Parker didn't rely exclusively on Mr. McDonough's sworn affidavit or even Biogen's job description. He looked at the DOT and the ONET, which are the national labor standards for the evaluation of Mr. McDonough's occupation. And he measured Mr. McDonough's limitations against what the DOT had to say and the ONET had to say. But he seemed to be doing that in terms of whether McDonough's work was or was not sedentary. And he concluded that it was sedentary, but he also looked at what was required in terms of those occupational demands. And one of the largest aspects there was the cognitive demands of Mr. McDonough's occupation as an IT manager. I guess I understood the district court was of the view that if you were an IT manager who could not use a computer at all, you were likely not able to perform your own occupation in the national economy because the district court says, at this one point, furthermore, Mr. McDonough has not demonstrated that Dr. Reyes suggested restrictions on handling or fingering work cannot be accommodated in such a manner that would allow him to remain in his position. I think that's correct, Your Honor. Okay, so could you just tell me, is there anything in the record that supports that thing, that addresses whether the handling or fingering work could be accommodated one way or the other? This record is silent as to the accommodation of Mr. McDonough's physical limitations with respect to keyboarding. And could you understand, this is I guess related to the same point about what we do with the silence on a key point in the record, is did Dr. Reyes say anything about whether it could be accommodated? He didn't. And what was interesting, Your Honor, is he makes this conclusion regarding the limitations of Mr. McDonough's right hand, but then he never equates it to the duties of Mr. McDonough's occupation. And I think that's really the fundamental failing in his report. You know, similarly, Dr. Dixit, who is the psychological examiner that really most comprehensively reviewed Aetna's case from a psych perspective, said, well, Mr. McDonough has all these physical symptoms, but that's not in my area of expertise. From a psych perspective, he's fine. But what she fundamentally missed is that it had been determined by that time that his psychiatric condition was so severe that it was causing his physical symptoms. So Aetna essentially pulled Mr. McDonough apart as a human being and said, you're good from a brain perspective, you're good from a physical perspective, but never looked at him as a whole person, which is really what needed to be done here. But you didn't put in there any evidence at any point that any accommodation would work, did you? I didn't, Your Honor, because it was, because Mr. McDonough's treatment providers never believed that an accommodation would work. He was never released to go back to work from a psychiatric perspective. Well, he was released to go back to work by his own doctor, as I recall, for up to eight hours a day, five days a week. That's Dr. Northrup's attending physician statement that was completed in August of 2009. But what's important about that form, first of all, that's not in the record, is that it was followed in October 2010 by a psychiatric form. Because by that point in time, it wasn't the physical that was disabling Mr. McDonough, they had determined that he actually never had a stroke, that what had happened is he had had a psychiatric event so severe that he caused physical symptoms to mimic a stroke. So what happened in October 2009 is that his psychiatrist and his therapist completed a form for Aetna that said that Mr. McDonough was functionally limited from returning to work in his own occupation. They said that they hoped that he would be able to do so in one year, in October 2010. Aetna misread that form as releasing Mr. McDonough to return to work in October 2009 and denied his benefits that same month. So the issue here is that Mr. McDonough had the burden of proving his disability, and by the time it was discovered that his disability was due to a psychiatric perspective, he did just that. He submitted evidence that showed that his psychiatric condition was limiting his ability to work. Aetna ignored those psychiatric claims, or let me put it this way actually, Aetna ignored that his occupation required significant cognitive function as detailed in Mr. Parker's report because he took that out of the O-Net and never evaluated his psychiatric symptoms against the demands of his occupation. Well, could we just go, I'm back on the physical side, just on what is the error in your view as to what Aetna did with respect to the physical disability that he had? I understand that the cause of the physical disability could have been psychological, but the physical manifestation of the disability, what is the error in your view as to what Aetna did with respect to that issue? I think it's twofold, Your Honor. The first is not evaluating Dr. Ray's limitations against the duties of Mr. McDonough's occupation, keyboarding and the mouse work, as we discussed. But the second is misreading or ignoring the functional capacity evaluation. Now, this Court and several other courts have always said that a functional capacity evaluation is really the gold star evaluation of functional limitations. And the functional capacity evaluation here that was performed at Spalding came up with a number of limitations that Mr. McDonough had, but most important for this Court is the fact that he performed in the low average range with respect to fine motor skills and handwriting for one and a half minutes at a time, and also that he had decreased endurance for the workday. In the course of a two and a half hour evaluation, he was not able to sustain without getting to a point of eight and a half out of ten, a pain point of eight and a half out of ten, the limited tasks that he was required to perform. And not giving credence to that functional capacity evaluation, I believe, is an abusive disability. And when you say not giving credence to it, meaning what? I forget if they mentioned it or did they? So the only doctor to actually mention it was listed in the documents that the various doctors reviewed, but Dr. Dixit and Dr. Burstein didn't evaluate it, they evaluated Mr. McDonough from a psychiatric perspective. Dr. Ray mentioned it, but he misrepresented what the results of the evaluation were. He said that it released Mr. McDonough to return to sedentary work, when in fact it said that Mr. McDonough had sedentary capacity with respect to load handling only, which is lifting. Dr. Swatinsky didn't address it in any substantive manner. And then could you explain what this, just do the exact same analysis you just did as to the aspect of McDonough's claim, which claims that the disability arises from his inability to handle the stress, et cetera. In other words, not the physical manifestation of it, but the psychiatric manifestation of it. I think the most fundamental aspect of that is his treatment provider said that Mr. McDonough suffered from panic attacks that were unpredictable, that four to five times a week, that lasted at least two hours on average. That alone would prevent Mr. McDonough from performing the duties of his occupation, but if you combine that with decreased concentration, decreased memory, and social isolation, this man was required to work as a team. He led a team, he was an IT manager, those symptoms alone would preclude him from performing the duties of his occupation. But what do we do with, on that score, is there anything in the Aetna form? I understand you might disagree with the conclusion, but if we're on an abuse of discretion standard, they seem to just think that although there is some evidence of those concerns, they weren't significant enough to overcome the uncertainty about how serious his psychiatric condition was. That sounds like just the kind of finding that we're supposed to defer to. I think that's right, Your Honor. But if you look at Dr. Dixit's report, which is where that's extrapolated from, Dr. Dixit says, look, she never actually takes into consideration the fact that his psychiatric symptoms were so severe they caused his physical. She says, oh, he has some physical symptoms over here, but he doesn't really have any psychiatric symptoms that are so fundamentally disabling. But she misses the central point here, is that his psychiatric symptoms caused his physical. No, but that's, I understand that argument, that he has physical disabilities that you think the Aetna report doesn't adequately address. I'm just trying to get a sense of, on the claim that he had psychiatric manifestations that they didn't address because he wouldn't be able to sit through the meetings, he couldn't handle the stress. It does sound like the Aetna report addresses that, and you're just contesting whether it was a good or bad finding, but we have to defer to some measure. So I guess I'm just asking where they go astray in making a finding that I know you think may not be the best one, but why is it an arbitrary one? I think it's because she never actually goes into the actual symptoms that Mr. McDonough experienced. She never talks about the panic attack. She doesn't talk about the social isolation. She just says, look, there's no objective testing to show that he has some memory and some concentration problems. But you really have to take his symptoms as a whole, and that's what's missing from Aetna's review. And I'm sorry, Your Honors, because I never got to the penalties aspect of this case. I would like to ask you, why should the penalty issue be in front of us at all, given the change in law in this area? Because, Your Honors, when we got the new plan document in the middle of litigation two weeks before summary judgment briefing was due, we amended our complaint to bring a penalties action against the plan administrator, Biogen, and the claims administrator, Aetna. We then brought, in our summary judgment briefing, we asked for penalties against both. And during oral argument, we asked the court to impose penalties against Biogen. It was Aetna, in response to a direct question from Judge Woodlock, that accepted liability for the penalties claim. So you say that basically you had an agreement, and the agreement overcomes the subsequent change in law. I don't think it overcomes it. I think that the proper remedy here, Your Honors, would be to remand this matter back to the district court to impose penalties, whether it's a $5,000 penalty or a higher penalty, against the proper party. We sued the proper party, unlike the plaintiff and traitor. We asked for penalties from the proper party. Aetna and Biogen are represented by the same counsel, and they admitted and accepted liability on behalf of Aetna. So I think the proper remedy would just be to impose penalties against the correct party that we sued. Any further questions? Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Steven Rosenberg for all of the appellees. Initially, let me clarify a couple of things. Yes. Can we start, just so we don't lose sight of it, can we start with the penalty question? Yes. All right. As I understand it, the appellant's counsel is correct in saying that you conceded before Judge Woodlock that Aetna was the proper party, if he were to impose a penalty at all, against whom the penalty should be imposed. And as I read your brief, you're really not challenging the imposition of the $5,000 penalty against Aetna. Is that correct? No. Well, we are, due to the change in the law. When it's said that we assented to the... And you don't think you're judicially estopped from asserting that? No, because when you... And I think we tried to make this clear in the brief. What happens is, at the time, the law, the First Circuit law, allows the court to impose a penalty either against the actual administrator, Biogen Eidig, or the LTD insurer. So when the court raises this issue, and the court has essentially told us, or at least implied what he said in his opinion, which is that the cause of this was inattentiveness on the part of Aetna, the court was clearly focused on Aetna, and its fact findings were directed at Aetna. And since the law in the circuit would have allowed Judge Woodlock to award a penalty at that time against either entity, we agreed with the court that, yes, you can certainly award it against Aetna. Now overall, in the judge's opinion, there's a little bit of uncertainty in the sense that the judge says that we agreed that Aetna's the proper party for all issues. The reality is that what that argument really was at the summary judgment briefing is that the denial of benefits piece, the benefits claims, are properly targeted to the LTD insurer, the party that controls administration and payment. So that got a little bit intermingled, I believe, in the opinion with the question of the penalty. You never asked that that opinion be corrected. That is correct. So I go back to my question, why doesn't that judicially stop you? We have a finding by the district court that you agreed as a basis for the finding. There's no effort on your part to correct it. I think that's a pretty classic case of judicial estoppel. Well, I think the answer to that, Your Honor, is that at the time, there was no reason to correct it. I suppose after Tetrault has decided, we could have. If it's factually incorrect, you should have corrected it. I don't believe it was factually incorrect prior to Tetrault and prior to the report. Whether you agree or not has nothing to do with Tetrault. Tetrault may explain the reason why you made the agreement, but lawyers make agreements all the time based on their misapprehension of what the law really is, and we don't want to leave them from concessions or stipulations because of it. Yes, Your Honor, and I think the point here, and I just want to make sure I'm clear on that, is I believe that Tetrault changed the law. I believe what we were agreeing to with Judge Woodlock was the law. But the counsel in Tetrault was able to make the argument. At that time, at the... Well, to put it in context, Your Honor, yes, we certainly could have argued that the proper reading... It didn't preclude you from raising that argument. It didn't preclude us, but the case law that, as we described in our brief, did hold that you could impose the penalty against the insurer. And both Biogen and Aetna had been sued at that point, so it could have been gone either way. Yes, Your Honor. So, it seems to me, as what I asked your sister counsel, and as Judge Selye said, essentially you agreed. Well, in essence, Your Honor, I agreed that on the law at that time, Aetna, which was where the court's fact-finding was directing it, could be the proper party for it. I don't believe... I do believe that Tetrault changed the law and that that would not be the same thing in front of Judge Woodlock after that. But to circle back around, Your Honors, the reality is that the judge's fact-finding found Aetna... Registered word, the last book. It is certainly true that if it went back to Judge Woodlock, he would be bound by Tetrault. The question is, when you invited them to have the penalty imposed on Aetna, was that because the law mandated that Aetna be the party that's subject to the penalty or because you read the law that way at the time? No, I understood the case law, the MetLife decisions in the First Circuit at that time to allow the judge... No, I'm not saying you understood that, but if the law... That's what I believe. Yes, I believe that the law at that time allowed the judge to pick his target. So in any event, that's where we are in that piece. Now, with regard to the benefits piece, there are a few things I should begin by clarifying. Initially, this is actually a perfect case of how the structure for discretionary review was supposed to operate and it operated correctly. All of the medical records that the plaintiff complains about, including Dr. James Parker, the vocational rehab person, all the treating medical issues and treatment and so forth, were somewhat conflicting, and frankly, they're complicated. As we hear, on the one hand, we're told by the appellant that Joseph Ray has found he has a functional deficit, and yet we're told it's a psychiatric condition, actually. So these issues are complicated. The discretionary review structure is premised on the idea that someone has to be the decision maker and that for cost purposes and structural purposes, that's the administrator subject to this question. I have some sympathy for that position, counsel, but I'm still troubled by the definition in your own policy of own occupation and the utter absence of any evidence in this record that would allow a rational fact finder to apply that definition. Is there anything in the record that indicates how this occupation is performed in the national economy? I think there are a couple of pieces. I believe that within the list of materials reviewed by each of the medical reviewers is the vocational data about the job in the national economy. But when you step back in reality, even if you use James Parker's explanations and descriptions, that review by James Parker is more favorable to Mr. McDonough than the national economy because he essentially says he can't do his job. I've read his records and he can't do his job at Biogenetic. The Aetna reviewers clearly reviewed, discussed, and considered James Parker's opinions in deciding that this man could continue with his job and could go back to work. One of them specifically addressed in detail why he disagreed with Mr. Parker. Another referenced it in his report. All reviewed it. And it's important to remember that this circuit has held that an administrator does not have an obligation to write a narrative response to every piece of medical evidence. If we had written a 30-page response to James Parker, we'd be hearing about someone else we didn't write a 30-page opinion against. If I'm an IT manager and there is a doctor who says I can't use my hand, don't you have to explain why that's not a problem? Well, the thing is... Your position is you don't have to say anything about that. Well, I think you have to, and I think the law is you do have to engage with the evidence. You can't just... Well, that piece of evidence. And we did. Joseph Ray, where this comes from, the idea that he has these limitations and that Judge Woodlock references and that the appellant references, also says in his report, and it's in the administrative record, and it's specifically quoted by Judge Woodlock as part of the basis for his decision, specifically says that those functional deficits, and I quote, would not preclude him from working in his own sedentary level occupation. So he may have these deficits, but the administrator is looking at the medical evidence and saying, okay, he has this restriction, but the same medical reviewers who are identifying the restriction are saying he can still do his own sedentary job. But how is that a... Just help me out. How is that a reasonable conclusion? Given the job. Well, I believe it's a reasonable conclusion. I know he said that, but... Because, as Judge Woodlock raised the same question, and the answer to that is they present Mr. McDonough as though he's a typist, as though he's doing data entry. He is not. He is a high-level IT professional. He is not required to sit there and type away all day. Yes, but any IT specialist often has to use the computer, often has to use the mouse, and many times today that may be at inconvenient times when your hand isn't up to the task. So why isn't that important? Well, I think it is important, but I think in the context of all of the medical evidence, including the one reviewer who identified that as an issue with this particular employee, all conclude that it's not enough to stop him from doing his job, including Dr. Ray. That he can work around that, that the hundreds and hundreds of pages of medical evidence allow him to do it. Now, you have to go back and remember his own treating physician. This isn't just Edna's medical reviewer, Dr. Ray. This entire process begins because his own treating physician says he can work. He can go back to his sedentary job five days a week. That starts the whole process. These Edna medical reviewers simply agree with him by doing a much more extensive workup. Obviously his primary care physician is responding to Mr. McDonough is in front of me and I see someone who can go back to work. The four or five medical experts who review it much later have gathered every piece of evidence that Dr. McDonough can submit and they're still ending up in the same place that his own treating physician said, he can go back to work. So I think cumulatively it adds up to the administrator properly evaluating it, considering it, and then concluding he can go back to work. Does the Edna report, the final report, the conclusion, the denial conclusion, engage with the various things that counsel identified about the physical limitations? So there's Dr. Ray's comment about the hand and then there's the, was it the functional capacity evaluation, is that what we called it? Which he also didn't do so great on with the gross fine motor skills, which would be consistent with the same conclusion that Dr. Ray reaches. As I read it, there wasn't much engagement at all in the Edna report as to those set of issues. I don't recall if the final denial letter discusses that in detail. Generally the final denial letter... Well, I guess I'm not in detail at all. The letter to my recollection references back to the review of the medical records and the medical evidence and the four or five medical reviewers who were charged with reviewing all of this evidence. And refers back to that and essentially I suppose the answer is it incorporates it. Because the reason for the denial letter are those medical reviews and the conclusions reached there. No one is sort of assuming that the claims department in and of itself can evaluate such a complex medical condition. We have a man here who first believed he had a stroke and the medical records show his own treating neurologist eventually writing in their reports that they had to invest most of their time explaining to him that he's fine. So essentially they're incorporating the medical reviews because that's who has to decide these issues. There's no way for them to handle it separately from that. Unless your honors have any further questions, I will stand on my briefs. Thank you. Thank you. Honors, I'd like to make just one point about the deterrent piece and the imposition of the penalties. I understand that overturning the judge's decision to impose a $5,000 penalty is a difficult hurdle for us to overcome. The judge Woodlock here offered deterrence as the basis for the imposition of the penalty and that deterrence is consistent with the legislative history of 1132C. It's a punitive statute. It's not meant to compensate plaintiffs for any prejudice or bad faith that they may have experienced as a result of the plan administrator's actions. Here, $5,000, which is less than one month of Mr. McDonough's benefits, can pass no reasonable test for the imposition for no reasonable argument to be as a deterrent. And I really By counsel, Judge Woodlock specifically found that there was neither bad faith nor prejudice. And we have, by my count, three cases in which we have affirmed the denial of any penalty for late disclosure in the absence of bad faith and prejudice. So if zero can be a sufficient answer to a penalty request without bad faith or prejudice, why isn't $5,000? Because Your Honor, the statute is, because Your Honor has sat on two of those cases and both of those cases this Court has said prejudice and bad faith is not required. I believe that it erroneously places the burden on the plaintiff to prove damage as a result of the plan administrator's failure to follow their obligation. The burden should be on the plan administrator to demonstrate why they aren't complying with the law. It's a punitive statute. You don't do what you're supposed to do and you subject yourself to the penalty. Justice Kayatta said just that during the Tatro argument. If deterrence is the goal that Judge Woodlock sought to achieve and that Congress sought to achieve by this statute, $5,000 doesn't do it in the context of this case. Thank you, Your Honors. If there's no further questions, thank you. All rise. The Court will take a brief recess. Okay. They're going to bump your case to last and call the next one assuming we have Mr. Casey's line. Yeah. Everyone's here? Okay. You can sit up at the table if you'd like. We're going to come back. I'm just a felon today and I've never had this before, so we'll see what happens together. Thank you.